DANIEL MAGEE et al. *v.* P. S. CATCHING et al.

1. CONTRACT: CONSIDERATION.—Any loss or injury to the promissee, or benefit to the promissor, however trivial, is a sufficient consideration to uphold a contract.

2. SAME: AGREEMENT BY DEBTOR FOR ANOTHER TO PURCHASE FOR HIS BENEFIT.—
Where a debtor, whose property is about to be sold under judicial process, or
a mortgage, or deed of trust, contracts with another, that the latter shall pur-
chase it for the benefit of the debtor, the agreement if consummated, will be
upheld, without any further or new consideration; the fact that the debtor trusts
to the agreement, and neglects to make a more advantageous sale, is a suffi-
cient consideration.

3. MORTGAGE: CONDITIONAL SALE: TEST OF.—It is of the essence of a mortgage,
that it is a security for a debt, which the grantor or mortgagor remains under
a legal obligation to pay, and wherever no such obligation exists, an agreement
to reconvey will not be a mortgage, but a mere privilege to repurchase.

4. SAME.—C., under an agreement with M. and the creditor, purchased M.'s pro-
perty at a trust sale, for his benefit, and executed his own note for the amount
of M.'s debt, and in satisfaction of it : C. afterwards agreed, in writing, with M.,
that he would reconvey the property whenever M. paid the debt. By the court:
the contract was not a mortgage, there being no liability on M. to pay the debt,
but an agreement to permit M. to repurchase, upon the condition specified in
the writing.

5. STATUTE OF LIMITATIONS : WHEN RIGHT TO REPURCHASE EXTINGUISHED.—The
right to repurchase, in a case where no time for its exercise is specified in the
agreement, will be extinguished by the lapse of the period of time prescribed
by the Statute of Limitations, for the institution of a suit for the recovery of
the property, if it had been held adversely.

APPEAL from the Vice-Chancery Court at Monticello. Hon. B.
C. Buckley, vice-chancellor.

On the 22d day of December, A. D., 1855, Daniel Magee, F.
W. Magee, and D. C. Dickson, filed this bill in the court below,
against P. S. Catching and —— Morehead, in which they alleged,
in substance:

That the complainant, Daniel Magee, in May, A. D. 1840, was
indebted to the Grand Gulf Bank on a note for about $6360, the
payment of which was secured by a deed of trust on several slaves.
The debt being due, and Magee being unable to pay it, the trustee,
under the provisions of the deed, by direction of the bank, had
advertised the slaves, and was about to sell the same. Magee being
unable, either to pay the debt or to procure a stay of the sale,
applied to the defendant, Catching, to attend the sale and buy the
property; the bill then states, that "previous to said sale, there
was an understanding between said Catching and Magee, to the
effect, that Catching was to bid off said property in his own name;

VOL. IV.—43

that he, Catching, was to assume the debt to the bank (the bank having agreed, in case Catching should assume the debt, to give an extension of time); and that Magee was to continue in possession of the property after the same should be sold, in order to enable him, by the labor of the slaves, and such other means as might be in. his power, to pay off said debt, which was to be renewed and secured, and said Catching was to hold the legal title to said slaves, as his indemnity and security for assuming said debt: the whole object being to prevent the sacrifice of Magee's property.

The sale took place in May, 1840, and Catching became the purchaser of eleven negroes, conveyed in the deed of trust.  He gave his note to the bank for $6360, in discharge of Magee's debt, or in payment of the slaves.  The sale was at public auction, and Catching was the highest bidder, but at what sum is not stated.

The bill further states, that Magee, confiding in the promise of Catching to purchase the slaves for him, did not make any effort to induce other persons to bid at the sale, and that the property was sold in one lot.  The property remained in possession of Magee until September, A. D. 1840, when Daniel Magee, F. W. Magee, and D. C. Dickson (these two last having, in the meantime, become interested in the slaves, but in what manner it is not stated), being about to remove to Texas, and the said Daniel Magee, finding "himself wholly unable to pay the debt," he surrendered the slaves to Catching, who thereupon executed the following instrument:

"GEORGETOWN, September 30th, 1840.

"This writing is to show that I purchased of Timothy T. Cooper, trustee, about last May, some eleven negroes, to wit (here their names are inserted), the property of Daniel Magee.  For the said property I gave my note in the Grand Gulf Bank for $6360, due some time in May, 1841.  Now, when the said Magee, or one D. C. Dickson, or one F. W. Magee, shall have paid said sum to me, or my administrators, or executors, or heirs, then it is my wish and intention to transfer the same, with all the right and title thereof, to the said F. W. Magee or the said Dickson, or any one whom they may designate; and in case of my death, I hereby require that my legal representatives shall perform the same act of justice to said Magee, or his heirs, after the said sum of $6360, due said

bank as aforesaid, shall have been paid by said Magee, or some one for him."

"Signed, P. S. CATCHING."

"Witness:

DAVID C. DICKSON."

Daniel Magee, F. W. Magee, and Dickson, soon afterwards removed to Texas, where they have ever since resided; and in 1854, F. W. Magee and Dickson, executed an instrument of writing before a notary public, by which they directed Catching to convey the slaves and their increase to said Daniel.

It is further alleged, that "for a considerable time after September, A. D. 1840, Catching remained in the possession of the slaves, and appropriated their labor to his own use. That Catching has transferred certain of the slaves to the defendant Morehead, who had notice of the complainant's title, and who still retains possession of the slaves so acquired by him." That, "at some time," as they are informed, the greater portion of said debt of $6360, was discharged by a compromise, and the sale of one of said slaves. That complainants do not know how much if any, of said debt, remains unpaid, but that the hire of the slaves, or the profits of their labor, which has been received by said Catching, is more than sufficient to pay the whole of it.

The bill prays for a discovery as to the hires and profits, and the alleged compromise, and that Catching may be charged with hire, and the value of such slaves as he may have sold, except the one disposed of to pay the debt to the bank, and for an account and reconveyance of the slaves.

The defendants demurred to the bill, and assigned for cause of demurrer, the following:

1. The bill shows no right in complainants, to have a specific performance of the agreement set up in the bill.

2. The bill shows no title or interest in complainants to the slaves mentioned therein.

3. The instrument under which complainants claim is without consideration.

4. The complainants do not show, that they have complied with

the condition of said agreement upon which Catching was to convey; nor do they show that the debt has been paid.

5. The bill shows that the original agreement was voluntarily abandoned; and,

6. The rights of complainants are barred by the Statute of Limitations.

The vice-chancellor sustained the demurrer, and dismissed the bill, and the complainants thereupon appealed.

. *Wm. Vannerson* and *E. Safford,* for appellants, cited 2 Story's Eq. Jur. § 1200; 23 Miss. R. 576; Chitty on Contr. 30; Story on Contr. § 431, to show that the consideration was sufficient; and on the point that the bill was not bound by the Statute of Limitations, they cited, *Marks* v. *Pell,* 1 John. Ch. R. 594; 2 Hill (S. C.) Rep. 178; *Ord* v. *Henning,* 1 Verm. R. 418; *Fenwick* v. *Reid,* 1 Merivale, 114.

*Wiley P. Harris,* for appellees,

After stating the case, argued as follows:

On this statement of the case the question arises, does the transaction amount to a mortgage? The scope and object of the bill, is to render Catching liable to account as a mortgagee, and the allegation is made that he was to hold the title as indemnity and security. The position taken in argument by the plaintiffs' counsel here is, that it is a mortgage, and that no time being fixed for the redemption, the mortgagor has the right to redeem at any time, however remote. Both of the counsel for the plaintiffs assume this position as the result of the writing of September, 1840, taken in connection with the facts which preceded it. That instrument states that when Magee pays the money a reconveyance is to be made, and the bill states, that according to the understanding, Magee was to keep the property, to enable him to pay the debt. It is, therefore, upon the proposition that Magee was legally liable to do something, that the position that a mortgage was intended rests. The allegation in the bill that the conveyance was a security, being founded on certain facts stated, and on contracts or writings made part of the bill, is not admitted to be true by the demurrer. It is a legal proposition. But, taking it to be true, it was necessarily the security for the fulfilment of the obligation

Magee et al. *v.* Catching et al.

which Magee was under, and the complainants' counsel assume that Magee had bound himself to pay a debt, and that he was to have the use of the property to assist him to pay it. The idea that the contract was one of simple indemnity merely, is negatived by the writing of September, 1840, and not relied on in the argument. Such a contract is inconsistent with the position founded on the writing, that Magee was not to pay until he chose to pay. Besides, it matters not that there was a contract to indemnify, if there was also an undertaking to pay a particular debt, because in such a case the party is bound to pay the debt when it falls due. When the relation of principal and surety does not exist, and it is not pretended that it exists here, an agreement to discharge or pay off a particular debt, for a sufficient consideration, binds the party to pay the debt when it falls due, notwithstanding there is a promise to indemnify generally. For example, where a party takes an assignment of a lease and agrees to pay the rent, for which the assignor is liable to the landlord, and to indemnify the assignor, or save him harmless therefrom; or where a party purchases a mercantile or manufacturing establishment, and contracts to pay the debts of the concern, and also to save the vendor harmless, the uniform doctrine of the court is, that the contract is broken by a failure to pay when the rents or debts fall due, and the measure of damages is the full amount of the debt. *Port* v. *Jackson*, 17 Johnson R. 239; In error, 479; Ex parte Negus, 7; 7 Wend. 499. See also the learned opinion of Chipman, Justice, in *St. Albans* v. *Curtis*, 1 Chip. Rep. 164.

There is a broad and intelligible distinction between the class of cases just mentioned, and those cases where the relation of principal and surety exists. The obligation which springs from this relation is one of indemnity merely, and the terms by which a security is given for its performance, are construed with reference to the primary obligation. The principal being still liable for the debt, when it has not been paid by the surety, ought not to be compelled to pay it to the surety, and remain liable to the creditor. This is the principle of the decision in *McLean* v. *Ragsdale*, 31 Miss. 701. In the present case, as well as in the examples cited, the party contracting to pay the debt is not liable to the creditor as a debtor, and if compelled to pay, is by that means discharged

from all liability, and is simply complying with a contract made on a full consideration received. His liability is measured by the terms in which he contracts, and it is not for him to say, that the other party has not been sued or has not paid. The substance of the undertaking is, that the debt shall be paid and the party liable discharged from it. We repeat, that this distinction is fully and clearly maintained by sound authority, and is founded in sound reason, and therefore assert that it is not material, that there was a contract to indemnify, express or otherwise, if part of the contract was, that Magee was to pay a particular debt not then due. The point in issue is, whether, according to the contract of the parties, Magee was to pay the debt when it fell due, or was to have "his own time" to pay it.

On the part of the plaintiff's counsel it is insisted that a security in the nature of a Welsh mortgage, was created, or an express trust of indefinite duration, and of illimitable responsibility to account. For the defendants, we insist, that whether it was a mortgage or contract to resell, the time of payment was the day on which the debt fell due, and that this is the natural, just, and legal effect of the transaction as presented.

The omission to state a time of payment, when there is a promise to pay, does not of itself give rise to the right to pay at any time, at the pleasure of the party promising. *Thompson* v. *Ketcham*, 8 Johns. R. 191, 192.

There is a well-settled legal policy, especially with us, which is averse to such a construction of a contract, as admits of unreasonable delay in the assertion of a right under it, or which would render an obligation indefinite as to time. In cases where no time is named, the courts look narrowly into the transaction, and to the circumstances which give rise to the contract, to see if there is not some feature of it, which indicates the time of performance, and with reference to which the parties must have contracted, and if the promise or contract be to pay a debt not due, the meaning of the contract would be that it was to be paid when the creditor had a right to demand it. In this case, the obligation of Magee, if there was any obligation at all, existed with reference to a debt which was to fall due in May, 1841. If his undertaking was to pay this debt, there was no necessity to fix a time when he should pay,

either at the time the agreement was first made, or when the agreement was reduced to writing, in September, 1840, because the debt, as was known by both parties, was to fall due at a future day. In May, 1840, it had twelve months to run ; and in September, it had nearly seven months to run. It is perfectly obvious that in May, 1840, there was no mortgage created of the nature of a Welsh mortgage, or such a mortgage as the one mentioned by Chancellor Kent, in the case cited by counsel, 1 John. Chan. Rep. 594, where there is an express agreement by the mortgagee to take the property and hold it, until the rents and profits shall pay the debt. The counsel for plaintiffs in error tacitly admits this. Indeed, the very terms of the understanding at that time, show that the mortgagor, Magee, was to keep the property and pay the debt. It would be absurd to hold, that if at that time Magee undertook to pay the debt, that the intention of the parties was, that he might pay it at any time he might see fit, or that the law would imply such a promise from the facts ; and it may be regarded as an incontrovertible proposition, that if there was nothing in the case but the first agreement, and by that agreement Magee was to pay the debt, there was no Welsh mortgage, but an ordinary mortgage, which became forfeited in May, 1841, and that, as a necessary consequence, it is now barred by the Statute of Limitations ; more than fourteen years having expired, without any recognition of the mortgage by the mortgagee.

The counsel however seeks to avoid this consequence, by invoking the instrument of September, 1841, which, as they contend, was founded on a new consideration. It is contended by them, that there were two agreements, one by parol, in May, 1840, and one in writing, of September following : that the first was not abandoned, but modified by the last. The new consideration was the surrender of the property by Magee. They insist that no time for redemption is named in the instrument, and that by its terms, the time for redemption is extended, because Catching requires his "executors to reconvey, thereby indicating that Magee was to be allowed to redeem, during the lifetime of Catching." It is respectfully suggested that no such meaning is even remotely indicated by the instrument. That instrument, by its language, carries to our minds irresistibly, the conviction that the writer felt, that he was granting an indulgence, and not making a contract.

He expresses a " wish and intention." This is not the language of a contract. If, at the time the money was tendered, he should be living, he could carry out his wish, but if he should die before that time, those who came after him might interpose that objection which arises on the face of the instrument. To provide as far as he could against this contingency, he requires his executors to reconvey,—and to impress them strongly, he speaks of it, as an act of justice which he is willing to perform, and desires them to perform, in case of his death before the time. This is the manifest meaning of that instrument.

If the position is taken that this was a new undertaking by the parties, founded on a new consideration, and growing out of a change of plans and purposes, we ask with what propriety can the complainants, the new parties introduced, claim at the hands of the court, that they shall have a reconveyance on any terms, but those on which, by the express language of the agreement, they were to be entitled to it. The agreement of September, shows a purchase, and a privilege to repurchase. It was competent for the parties to modify the first understanding, or to abandon it. New parties came in, who certainly are not debtors, and, by general consent, the transaction is converted into, or treated as a purchase, and not as a mortgage. The act of surrendering the property to Catching, was voluntary on the part of Magee. It is not pretended that it was extorted by Catching. The rule that " once a mortgage always a mortgage," applies to agreements made at the time of the mortgage, by which the right to redeem is restricted, but not to subsequent agreements fairly entered into, without fraud or oppression, by which the mortgagor parts with his right to redeem, or converts it into a contract to repurchase. 1 Hilliard Mortg. 70, 88; 1 Powell Mortg. 123; *Ransen* v. *Hoy,* 1 Edw. Ch. 535; *Russel* v. *Southard,* 12 How. U. S. 139.

No fraud or oppression is charged. The complainants rely upon the agreement as fair and valid. What equitable consideration arises in favor of F. W. Magee and Dickson, which should induce the court to depart from the manifest terms and stipulations of the contract? Will the court undertake to say, that where no fraud or unfairness is imputed, that a mortgage cannot be converted into a purchase with a contract to repurchase?

We are convinced that no such doctrine can be found in the law books. And in this connection we insist, that if in consideration of the surrender of the property, the parties took an agreement which deprived Catching of his right to foreclose the mortgage and gave a perpetual right of redemption or repurchase, (and this is the construction put upon the contract of September, by the counsel), then it is manifest that no mortgage is created by the agreement, but simply a privilege to repurchase at the election of Magee. It is far more reasonable and equitable to hold that a contract to repurchase, was made by the instrument of September, 1840, than that a mortgage was created, by which Catching was liable to account for an indefinite time; to become, in other words, a mere overseer of Magee's slaves. In the first place, the privilege to repurchase, is fairly and clearly expressed in the writing, and the Welsh mortgage, or the agreement of the mortgagor, to take the property, and hold it until the profits shall pay the debt, is not expressed.

We state the following as well-established propositions. The law will never by implication create such a mortgage, nor such a trust, from mere acts of parties, when no fraud is imputed, in the absence of express language to that effect, in the agreement of the parties.

Such mortgages can only be created by the express agreement of the parties, and in construing the language of such agreements, the courts will lean against a construction, which goes to establish such a contract as a mortgage, with a perpetual right to redeem and to call for an account.

In order to protect the mortgage, and to discountenance this species of security which makes the mortgagee the "perpetual bailiff" of the mortgagor, the courts were at first inclined to hold that the mortgagee might call upon the debtor to redeem and compel him to do so, or be foreclosed, but upon full consideration, it was decided that there could be no forfeiture, and consequently no right to foreclose. 4 Kent's Com. 163 (note); 2 Cruise's Title to Mortgage, 291; *Howel* v. *Price*, 1 Peere Wms. 291; 1 Vesey, 406; 1 Atkins, 360.

We also refer to Angel on Limitations, Ed. 1854, p. 571.

The courts were always averse to contracts so unreasonable, but held themselves bound to carry them out when there was an express agreement.   The case mentioned by Chancellor Kent, in 1 John's Ch., cited by the opposing counsel, are cases of express agreement to hold the property until the profits shall extinguish the debt.    These are not mortgages in the strict sense of that term, since there never can be a forfeiture.   There is no instance to be found of such a mortgage at common law, except the Welsh mortgage or its equivalent, to which there is no right to foreclose, or to which there is no forfeiture.   In New York, by statute, a mortgage may be created by the common law, without this feature, the right to foreclose, but except in the case of a Welsh mortgage, no such thing exists here.

We have never met with such a mortgage in practice, and believe that it would never occur to anybody in this country, that such a security was intended in any case, unless there was express mention of it by the parties.   But the counsel had two objects to subserve. They must have a mortgage, in order to claim an account for hire, and while constructing it, they felt the necessity of constructing one which would survive the delay of fourteen years.

In England, where landed estates in many cases are under lease with a fixed rental, such a mortgage would not excite remark, but here, such a contract would be unusual, and contrary to the general business habits and condition of the country.   It is not probable that the parties intended such a security, if security was intended.

Another position taken by the counsel in argument is, that an express trust was created, to which the Statute of Limitations does not apply.   A mortgage is not an express trust.   The instrument of September, 1840, shows for itself.   That is not an express trust to take the property and hold it until its profits pay the debt.   The authorities on this point are decisive.

" There is certainly no trust expressed in the contract of mortgage.   It is only raised, therefore, by implication."   Angel on Limitations, Ed. 1854, 571.

As an implied trust, the Statute of Limitations applies to it. The instrument of September, 1840, is not a trust of any kind, unless we hold that every contract is an express trust.   If under the contract, Magee had tendered the money, and Catching had

refused to reconvey, supposing the contract to be valid, a court of equity would say, that Catching was constructively a trustee of the title, from the time of the tender and refusal; but to speak of this instrument as creating an express trust, is to produce a confusion of ideas. If, by external evidence of the acts of the parties, or of their previous relations, a trust is declared to exist in such cases by the courts, it is well understood that the trust is an implied trust, and that the Statute of Limitations will apply.

This is the doctrine of the courts. " It is indeed perfectly clear, that whenever a person takes possession of property as owner, and is afterwards, by matter of evidence, or by construction of law, changed into a trustee, lapse of time may be pleaded in bar." Angel on Limitations, State Lib. Ed. 1854, 579. Of what consequence is the assertion, that this is an express trust, after the explicit language of the authorities on this subject? An express trust has a definite meaning, and so long as it continues, there is no limitation to the trustee's liability; but he must be a trustee under an express trust. The express trust and the Welsh mortgage, being the only contracts which can escape the Statute of Limitations, of course it was to be expected, that this case would seek the shelter of one or the other.

It is not pretended, that by the agreement of May, 1840, Magee had a right to pay at any time however remote, and we insist that there is nothing contained in the writing of September, 1840, from which we are to infer, that it was the intention of the parties to extend the time indefinitely. The same debt remained unpaid, and had seven months to run; the undertaking to pay, if there was such undertaking, had reference to a debt not due, and that fixed the time of payment, unless the parties expressly agreed to waive the time. There is no such intention expressed, and the court will hardly presume so material a modification of the rights of the parties, as is involved in the proposition, that Magee was not bound to pay until he chose to pay. We think therefore, that whether the contract was a security, or a purchase with a privilege to redeem at Magee's election, it is perfectly clear, that the time for redemption or repurchase was definitely fixed by the time of payment of the debt, which was to be paid, and that no rational interpretation of

the contract would give to Magee his own option as to the time, to do the one or the other, and that both the time for redemption and the time for repurchase has passed.

We think however that it is a contract to repurchase. Taking the facts stated by the complainants, as the attendants of the transaction in May, 1840, and throwing aside the names applied to them, by the solicitor, and they amount to what is affirmed by the writing of September, 1840, which was manifestly designed to "show" the relations in which the parties stood towards the property, and towards each other. Now it is quietly suggested by the counsel, that an important change of the first agreement was made by the last; but was there any change of the facts attending the sale of May, 1840 ? Was there any motive to suppress them, or to vary them, or to state a palpable falsehood? The instrument, under which F. W. Magee and D. C. Dickson claim the right to direct Catching to reconvey the property, and on which the complainants' bill rests, makes a recital of certain facts. It is not alleged that the writing is false, and its language is clearly that of one who meditated no fraud. It sets forth a purchase, with a privilege to repurchase at the election of Magee. Is it competent for parties deriving title or power under this instrument, to disregard its terms and recitals, and to introduce new terms and obligations? We think not. This instrument says, the note was given for the purchase-money, and that Catching was the purchaser of the property, for the sum for which the note was given from the trustee. The facts show that he bid the property off at the sale, and that Magee purposely avoided the use of any means to stimulate bidding, or to cause the property to bring a full price. Catching gave for the property $6360, according to the writing of September. The bill does not state what he gave. If he gave that sum, he bid about the amount of the debt. Counsel may call this an assumption, a renewal, or anything he chooses, but the fact is, that it was a purchase, the bank consenting to give the purchaser time on the purchase, and the purchaser agreeing to give Magee the benefit of the purchase, provided he would pay the price bid.

There are certain features which almost unerringly mark a contract of repurchase, the purchaser being fortified by the consideration, that he has got the value of his money, at all events, and that

the vendor's interest will impel him to repurchase, takes no covenant or promise from the vendor to repurchase. Supposing the contract in this case to have been one of that character, it explains what would otherwise be without explanation in this case. It explains the absence of any reservation to Catching, of a right to enforce the payment of the money; and it explains the reason which induced Magee to desire that the property should pay the amount of debt due to the bank, and no more. When we associate these features with the character given to the transaction by the instrument of September, 1840, the nature of the contract seems to be fully made out. It was a sale on a credit, with a stipulation in favor of the party whose property was sold, by which, on the payment of the price, he is to have a reconveyance of the property. An agreement made by a debtor, whose property is about to be sold, with a third person, by which the latter is to purchase the property at the sale, and allow the debtor to regain the property by paying to the purchaser the amount of the purchase-money, is not a mortgage, but a contract to repurchase. This is the precise nature of the case here, by every test.

The fact that the property, by agreement, was in the meanwhile, to wit, until the day of payment, to remain in the hands of the debtor, is not decisive of the character of the contract; for we know that in practice, the question, whether a particular transaction is a mortgage, is never determined by the fact of the possession being in one or the other of the parties.

The case therefore is to be determined by other tests. We insist that the agreement, which has just been described, cannot be regarded as a mortgage, because there is no debt existing between the purchaser and the debtor. There is no loan of money, and no binding obligation on the debtor to pay, resulting from the contract. The mere use of the word pay, in the writing of September, 1840, is not material. The substance of the transaction is, that the debtor may repurchase at his election. See *Heckman* v. *Cantrell*, 9 Yerger, 180.

In the present case, there is no acknowledgment of a debt due to Catching, either in the first instance, or in the writing produced. The debt due by Magee to the bank was discharged, and the deed of trust extinguished. Catching took no assignment of the debt

from the bank—no promise or covenant from Magee to pay him—reserved no right to sue or to foreclose the pretended mortgage.

Unless the relation of debtor and creditor exists between Magee and Catching—unless there is some legal obligation on Magee to pay the money, it is impossible to make a mortgage out of the contract; and we ask where is the evidence of such debt or obligation? Where is the covenant or promise?

All the well-known tests of a mortgage may be applied in vain to the transaction. The doctrines of the courts of the highest authority, announced in well-considered cases, show that this cannot, without denying to grown men the right to make a contract, be a mortgage.

In 7 Cranch, 218, Chief Justice Marshall said: "The inquiry must be, whether the contract is a sale or a security for money. If it is a mortgage, then the mortgagee must have a remedy against the person of his debtor; if this remedy does not exist, it is a sale, and not a security." The correctness of the principle thus stated, cannot be questioned. Without some obligation binding on the party to pay, a conveyance cannot be called a security. In *Glover* v. *Payne,* 19 Wendell, 518, the court declared: "When there is no debt, and no loan, it is impossible to say, that an agreement to resell, will change an absolute conveyance into a mortgage." In *Holmes* v. *Grant,* 8 Paige, 243, where a conveyance had been made in payment of a debt, and the purchaser agreed to resell to the debtor, on payment of the debt and interest on a particular day, it appeared that the note, or other evidence of debt, was surrendered or cancelled at the time of the conveyance. The court held, that as the debt was extinguished, and no new one created, the contract could not be regarded as a mortgage.

In *Robinson* v. *Crosby,* 2 Edw. Ch. Rep. 128, the court said: "The only question here is, whether the relation of debtor and creditor exists;" citing 7 Cranch, 216, and *Goodman* v. *Grierson,* 2 Ball and Beattie, 274. In the case last cited, the chancellor said: "Are the remedies here mutual and reciprocal? Has the defendant the rights of a mortgagee? Can he foreclose, and should the property not bring the amount of the money, has he any remedy for the balance?" We add to these leading cases, the decision of our own court in *Hoops* v. *Bailey,* 28 Miss. Rep. 328.

Suppose we were to take the construction put on the contract by the plaintiff's counsel, to wit, that Magee was not bound to pay at any time, and the writing of September, 1840, which does not bind Magee to pay, and what is the result? It is a mere privilege to repurchase at Magee's own election. It is not necessary that we should argue here, that there was a limit to the time within which a repurchase was to be made, since there has been no offer to repurchase, or refund the money; but if the contract is such as the counsel contends it is, to wit, a contract by which Magee, or his heirs, may pay at any time, however remote, it is conclusive against the idea of a mortgage. Such a contrivance as a mortgage without the power to foreclose, except in the case mentioned by Kent of an express agreement, that the mortgagee shall take the property, and hold it, until he is paid by the rents and profits, a Welsh mortgage in other words, is unknown.

The difference between the contract to repurchase at the party's own election and the contract of mortgage, is very important; but it is difficult to find in this difference, any sufficient reason for a court to make a contract which the parties did not make, or to create a mortgage *ex gratia*. Under a contract to repurchase, it is true that the party is held strictly to the day appointed for performance, and is not entitled to an account for rents and profits: but he has this signal advantage in the case of slaves especially; if they should die, or diminish in value, by any of the causes which produce fluctuation in prices, he may decline to repurchase, and the purchaser is bound to suffer the loss. He cannot compel the party to repurchase. The fact that it sometimes happens that the use of the property exceeds in value the interest of the money, is of little importance when we reflect that it is in the power of the vendor to repurchase the next week or the next hour. The question of profit and loss in many instances, in the case of family servants for example, is not the controlling consideration. In the present case it appears, that the price for which the slaves sold (it is not stated in the bill, but appears in the written statement of September, 1840), was full, according to what we know of the average value of slaves in 1840. No attention is due to the statement that they sold for less than their value, when it is not stated what they brought. There were three children under twelve years

of age, and two under fifteen; some old negroes, and some young ones. The average price was above five hundred dollars. The statistical tables of that period will show, that this is above the average value of such property at the time. There is no apparent advantage gained by the purchaser, and Magee seems to have made the arrangement which, in his judgment, was the best.

It was competent for the parties to make it, and there does not appear to be any circumstance in the case which should induce the court to incline against a contract to repurchase. It is stated in the bill that Catching sold part of the property, but it is not stated when this took place. If it took place after the debt due the bank matured, he had a right to sell the property. He had a right, supposing that the contract had a valid consideration, to dispose of it, after waiting a reasonable time for Magee to come forward and pay the money. The idea that the law would give such an effect, to the simple transaction set forth in this case, as to tie up the property in Catching's hands for fifty or a hundred years, is preposterous.

In considering the case so far, the terms "renewal," "assumption," and "indemnity," as they appear to be employed only as denoting the construction put upon facts to which they are obviously inapplicable, have been made to yield to the facts and to the terms, used by the parties in the written instruments which describe the transaction. If, however, it should be determined that a security, and not a sale, was intended, against the demonstrative evidence that a sale was not only contemplated, but took place, and that in the outset the contract was a mortgage, it is perfectly evident that the parties subsequently chose to treat it as a sale, and in defining the situation and rights of each other, Catching was declared a purchaser, and the other parties took a privilege to repurchase.

The authorities cited by the plaintiffs' counsel, do not apply to this case, and cannot control it. He cites *Lindsey* v. *Platner*, 23 Miss. 576; and in this connection we propose to notice the subsequent case of *Soggins* v. *Heard*, 31 Miss. 426. In the first case, the party purchasing the property, informed the persons attending the sale, that he was buying for the benefit of the widow of the deceased debtor, and by that means obtained a great advantage in

getting the property very low. The purchaser in this case, was held to be estopped to deny that he purchased for the benefit of the widow. The sale was set aside at the instance of the administrator of the estate, for the benefit of creditors. Here was a case of fraud, and of equitable estoppel. In the case of *Soggins* v. *Heard*, it appeared, that the owner of land and slaves had executed a deed of trust on the slaves, to a surety. The land was levied on, and the surety agreed to buy it for the benefit of the debtor; and after the purchase by him, there was an agreement that the purchaser should work the slaves on the land for a year, and after that time to sell the land and slaves, and from the proceeds to pay the debt for which the purchaser was surety, and also the amount expended by the purchaser. This contract was carried out by a sale of the land and part of the negroes. Heard appropriated part to the payment of the debt, and kept the balance; and the question was, whether he should pay over that balance to the debtor. Here was not only an agreement, but it was carried out and recognized in such a way, as to induce one party to allow his slaves to be sold.

The question in the last case was: Shall the party be compelled to carry out his express agreement? The question here is: What was the defendant, Catching, bound to do by the terms of his contract? An individual buys property at a sale, under an agreement that if the debtor will pay him the price he bid, if he bought for cash, or the purchase-money when due if he bought on a credit, he will allow the debtor to have the advantage of the purchase, and a reconveyance. It is to the debtor's interest that one man should buy all of the property, and that he should buy for as small a sum as will be sufficient to pay the debt for which the property is sold. The contract is reduced to writing. The question on this state of facts, according to the position assumed by the counsel in this cause, is whether the debtor may decline to pay the price, and wait until he thinks it to his interest to come forward and claim the property? The effort is made to enable this transaction to pass through the Statute of Limitations, in the disguise of a Welsh mortgage or an express trust. We insist that if it is a mortgage security, it is barred by the Statute of Limitations; that the contract in writing is simply a contract and not a trust; that if any trust is created beyond the terms of that contract, it is an im-

plied trust, and barred by the Statute of Limitations. But we insist that the contract is one which, if it is founded on a sufficient consideration, entitles the complainants to a specific performance of it, according to its terms, and only upon paying the price for which the property sold.

There is no allegation in the bill, that Catching was to take the property and devote it to the payment of the debt, or that he was to devote the profits of its labor to that object. The contract was, that Magee was to pay the money. We insist, that to allow Magee to wait fourteen or fifteen years without offering to comply with the agreement, and then to come forward on the pretence that the property has increased in value, and that he is informed that the debt which Catching owed for the property, was compromised for a sum less than the original amount claimed, and claim that the hire of the slaves shall be accounted for, and applied to discharge the debt, would be to disregard the contract. It is perfectly apparent, that if the property had perished or declined in value, Catching had no recourse upon Magee. Magee voluntarily, without any fraud or oppression on the part of Catching, having determined to remove to a foreign republic, gave up the property to the purchaser, and reserved the privilege to repurchase at his election. Why he should be exempted from the effect of this contract, it is impossible to perceive. The complainants rely upon matters, which they say probably occurred after the contract was finally concluded in September, 1840,—matters *ex post facto ;* but they furnish no rule for the interpretation of the contract, which the complainants say was never "altered or modified by their consent," after the 30th of September, 1840.

It is not important, on the interpretation we give to the contract, to discuss the question, as to whether the contract of the 30th of September was founded on a sufficient consideration. It has not been complied with; but on the authority of the case of *Vasser* v. *Vasser,* 23 Miss. 378, if we are to take that contract, as the parties seem to have designed it, as showing the relation in which the parties stood to each other, and to the property at the time, it is a *nudum pactum.* There is nothing on its face to give it validity. The term "act of justice," as applied to the reconveyance of the property, has no broader signification than the facts to which it

applies. The instrument itself furnishes an irresistible argument, that Catching thought he was granting a favor only. At that period, a forced sale of property was generally regarded as a sacrifice of it. The valuation law shows the feeling of the legislature in regard to it. The public opinion of the time strongly condemned a man who would offer to buy property at such sales. Combinations were formed by citizens to prevent execution-sales. To allow a debtor to repurchase, on paying the price for which the property was sold, was considered an act of justice, and that the expression should occur in connection with a promise or "intention" to allow this privilege, creates no surprise, and does not warrant the inference that there was anything more in the transaction than appears by the instrument in which it is set forth. In 1838 and 1839, the same property would have sold for near three times the amount it would have brought in 1840. At this day however, it would be absurd to hold, that a party, by purchasing property at a price depreciated by the circumstances of the times, was under a legal obligation to allow the debtor to redeem it. To convert a promise to do so, into a Welsh mortgage or express trust, and force the purchaser to account, by an uncertain and fallacious standard, for hire for a period of fifteen years, during which the debtor has neglected to avail himself of this privilege, would be gross oppression. . We think the demurrer to the bill was properly sustained.

FISHER, J., delivered the opinion of the court.

This is an appeal from a decree of the Vice-Chancery Court at Monticello, sustaining a demurrer to the complainants' bill.

The bill alleges that the complainant, Daniel Magee, was, in May, 1840, indebted to the Grand Gulf Bank in about the sum of $6360; that to secure the payment of the said debt, he had prior to that time, executed a deed of trust on the slaves now in controversy, to one T. S. Cooper. Being unable to pay the debt, and the trustee being about to sell the property, the complainant made an arrangement with Catching, the principal defendant, to attend the trustee's sale, and purchase the slaves; that it was part of this arrangement that Catching, after the purchase by him, should assume the debt to the bank (the bank having already agreed to this arrangement), and that the complainant should continue in

possession of the property, and from the labor of the slaves, and such other means as he might have, pay off said debt; that the sale was accordingly made; that Catching, according to the understanding of the parties, became the purchaser of the slaves, and assumed the debt of the bank for $6360; that the complainant's debt was accordingly discharged in this way.

The bill further alleges, that in September, 1840, the complainant, having determined to remove to Texas, the slaves were surrendered to the defendant, Catching, who executed a writing, reciting the purchase of the slaves at the trustee's sale; that he had given his note for the same to the Grand Gulf Bank for the above amount, due in May, 1841, and agreeing that when the complainant, Daniel Magee, D. C. Dickson, or F. W. Magee, who had become in some way connected with the transaction, should have paid said sum to him, his administrators, executors, or heirs, "then it was his wish and intention to transfer the slaves, with all the right and title thereto, to the said F. W. Magee, or the said Dickson, or any one whom they might designate;" and in case of his (Catching's) death, it was stipulated that his legal representatives should perform the same act of justice to said Magee, or his heirs, after the payment of the above sum.

It appears that Daniel Magee, F. W. Magee, and Dickson, removed to Texas, as contemplated, about this time; that the defendant had continued in the possession of the slaves, except such as he had sold, until the filing of the bill.

It is further alleged, that the defendant, by a compromise with the bank, paid off the note above stated, at a considerable discount; but the terms of this arrangement are not definitely stated for want of information by the complainant; that the defendant has sold one of the slaves, and from the proceeds of this sale, and the hires of the slaves, for which it is alleged the defendant is liable, he has been fully reimbursed the sum paid to the bank. The object of the bill is to have an account taken of the hires of the slaves, and of the sale of the slave John; and if it shall then appear, that the complainant has not been fully reimbursed, the money by him paid to the Grand Gulf Bank, the complainant will pay such balance, which being done, he prays for a transfer of the slaves to him. To this bill the defendants below demurred, and the court, sustaining the demurrer, the complainant has prosecuted this appeal.

It is said that this agreement, not resting, as is contended, upon any sufficient legal consideration, was not binding upon the defendant, and that he could therefore disregard it. It is now firmly settled, that a party, whose property is about to be sold, either under judicial process, deed of trust, or mortgage, may contract with another to become the purchaser of such property, at the sale to be made for the benefit of the debtor. The law never looks to the amount of the consideration to uphold a contract, so that there is a consideration, though trivial, moving the parties. Loss or injury to one of the parties, or benefit to the other, may be a sufficient consideration. The debtor, in such case, by trusting to the agreement of the party to purchase, may be prevented from raising the money to pay the debt, or from making a more advantageous sale of it to another, with the consent of the creditor. But the rule is now settled, and it is therefore not necessary to enter upon a defence of it. The subject being one about which the parties might contract, the question is, did they contract, and how have they contracted? The first part of this inquiry may be answered in the affirmative, and our examination will therefore be confined to the construction of the contract as set forth in the bill, and the rights of the parties under such contract. The object of the bill is for a specific performance of the contract; that is to say, a recovery of the slaves. The writing of the 30th of September, 1840, must be treated as the contract between the parties, and what is alleged in the bill, as referring to the consideration to support the contract, thus reduced to writing. What then, is the contract? Is it a mortgage? Clearly not; for the obvious reason that the complainant owed the defendant nothing; that is to say, nothing which the complainant could compel the defendant to pay. If the property should prove insufficient to reimburse the defendant Catching, or should be wholly lost, he could assert no demand against the complainant. It was then simply a contract, that the complainant, upon paying to Catching a certain sum, might repurchase the property, or what is the same thing, divest the title of the latter. This being clearly the contract of the parties, the next inquiry is, in what time was it to be performed? The answer must be, within a reasonable time, which means such time as would bar the plaintiff's remedy, if the defendant's possession, had been from the beginning,

adverse to the title asserted by the complainant.   Contracts of this nature, stipulating no time for performance, must be performed within a reasonable time.

This rule, resting as it does upon sound policy, should never be departed from, merely to relieve against the hardship of a particular case.   The law exacts a certain degree of diligence in the assertion of rights; and it has now almost ripened into a maxim, that rights not asserted within a reasonable time, are treated as abandoned, or as surrendered to the opposing party.

We may in conclusion remark, in regard to this case, that there is nothing in it recommending it to the special favor of a court of equity.   The defendant was no doubt moved solely by considerations of friendship towards the complainant, in entering into this agreement, and while it is one binding upon the parties, yet it having originated in the friendship of one of the parties, assuming a pecuniary responsibility, as well as risk and trouble, the other party ought to show that he had respected the laws of reciprocity in this respect, to entitle him to the favorable consideration of the court.   As argued by counsel, it certainly never entered the minds of the parties, that the defendant was to become the mere bailiff of the complainant, to manage the property, to be responsible for it, as well as for the debt to the bank; and to account at any length of time when it might suit the complainant's convenience.   If what is now contended for in behalf of the complainant, had been proposed in the first instance, as the contract of the parties, it is manifest that it would have been rejected.   No prudent man would, upon the score of friendship alone, for another, enter into a contract so indefinite as to time, as to give that other his lifetime, to call for an account in regard to property, which may have been an incumbrance instead of a benefit.

We therefore think, that whatever may have been the complainant's equity, if he had been more diligent in performing his contract, that he is now barred by lapse of time, and that the demurrer was therefore properly sustained.

Decree affirmed.

See *Soggins* v. *Heard*, 31 Miss. R. 426.