SMALLER WAR PLANTS CORPORATION *v.* QUEEN CITY
LUMBER Co. *et al.*

(In Banc. Oct. 14, 1946. Suggestion of Error Overruled Nov. 25, 1946.)

[27 So. (2d) 531. No. 36146.]

Wells, Wells, Newman & Thomas, of Jackson, and Ben Wilkes, of Greenville, for appellant.

**Ernest Kellner**, of Greenville, for appellees.

632

Wells, Wells, Newman & Thomas, of Jackson, and Ben Wilkes, of Greenville, for appellants, in response to Court's per curiam.

**Ernest Kellner,** of Greenville, for appellees, in response to Court's per curiam.

Argued orally by **Earl T. Thomas** and **Ben Wilkes**, for appellant, and by **Ernest Kellner**, for appellees.

**Roberds, J.**, delivered the opinion of the court.

This case, in its final analysis, turns upon the respective rights of Homer Lunceford and Queen City Lumber Company, complainants below, appellees here, on the one hand, and Smaller War Plants Corporation, a respondent below and the only appellant here, on the other hand, to a certain special fund designated on the books of respondent Julius Sorenson & Sons as "Suspense Account", and which fund, at the time of the arrangement hereinafter set out, amounted to $59,006.45, and the balance of which appellant later appropriated and applied to a debt owing it by Sorenson. The chancellor granted a personal decree against War Plants Corporation for $605.62 and $5,436.83 in favor of Queen City Lumber Company and Homer Lunceford, respectively, with legal interest thereon from May 23, 1944, until paid, from which decrees Smaller War Plants Corporation appeals.

The rights of the parties to this fund arise under the following circumstances: The United States of America (which will hereinafter be called the Government), acting through Lt. Col. R. W. Sauer, its District Engineer stationed at Vicksburg, Mississippi, on July 15, 1943, entered

into a written contract with Julius Sorenson & Sons, a copartnership of Racine, Wisconsin, under which Sorenson agreed to manufacture, sell and deliver to the Government at Greenville, Mississippi, two million concrete units, or blocks, Sorenson to furnish all machinery, equipment, labor and materials for such purpose. The Government agreed to pay $350,000 for the blocks so manufactured and delivered, payments to be made in designated installments as the work progressed. The contract vested in the Government extensive control and supervision in the production and delivery of these units. It had the right, within specified limits, to increase or decrease the total output; had the power to, and did, prescribe the specifications of the blocks, with the right to change them to suit the needs of the Government, and to accept or reject the blocks after inspection. Sorenson was required to furnish the Government detailed reports during the operations. The Government could terminate the contract ". . . whenever the contracting officer shall determine such termination is for the best interest of the Government . . .," and "take any action it thought best . . ." to secure to the Government its full rights and benefits under the contract. It had other powers not necessary to detail. The contract further provided that all disputes between the contracting parties would be arbitrated by the Secretary of Labor; prescribed the maximum hours of work and minimum pay for labor, and prohibited discrimination in the employment of labor. It was a war contract and expressly embodied certain applicable War Acts of the Congress. The blocks were to be used for revetment purposes in flood control work on the Mississippi River.

It was necessary for Sorenson to receive financial aid to carry out the contract. He applied to the Reconstruction Finance Corporation for a loan. That Corporation referred him to its subsidiary, Smaller War Plants Corporation. That corporation agreed to lend Sorenson $110,000. It did that. Sorenson, to secure the loan, on November 4, 1943, executed a deed of trust upon its plant at Greenville,

including the real property, all machinery, tools and equipment connected therewith, except such as was under lease. The debt was to be paid in stated installments. The debt and security therefor were transferred by Smaller War Plants Corporation to its statutory agent Defense Plant Corporation, for "servicing and supervision" of the loan in cooperation with appellant. It might be added that both of these corporations had been created under Act of Congress for the purpose of prosecuting World War II.

Sorenson proceeded with the work until May 18, 1944. To that time, he had manufactured some 570,680 units. He had lost about eighty thousand dollars on the contract; was behind on his payments to appellant; had overdue bills for rentals, labor and materials. He was in bad financial condition.

Appellant thereupon sent to Greenville, Mr. E. A. Schroeder, Assistant Regional Loan Agent of the Smaller War Plants Corporation, and Mr. Stephen O. Brattleaf, Reconstruction Finance Corporation Examiner, for the purpose of investigating and reporting the status of Sorenson's affairs, with their recommendation as to what should be done.

These gentlemen first conferred with Col. Sauer, the Government contracting-supervising Engineer, at Vicksburg. This conference considered, among other things, the advisability of terminating the operations, or extending them and increasing the total output, as well as certain measures designed to reduce the expense of operations, especially the expense of inspection by the Government of the finished blocks, this work theretofore having been done by three inspectors at a monthly cost of two thousand dollars, whereas, in the opinion of Brattleaf and Schroeder, it might have been done by one inspector at a monthly expense of one thousand dollars. That expense had been charged to Sorenson.

Arthur Sorenson, one of the partners, had been manager in charge of the work at Greenville. On the morning of May 23rd, Schroeder and Brattleaf conferred with him. They discussed with Sorenson his financial condition, and

the feasibility of his fulfilling the contract; informed him they had called a meeting of his creditors with a view to change in management, "and to determine whether arrangements could be worked out to continue the project . . .," and "Mr. Sorenson expressed his willingness to cooperate in any way possible."

The Government representatives then met with the three largest creditors and went over the situation with them. That afternoon a general creditor's meeting was held. Brattleaf and Schroeder had a statement of the financial condition of the contractor. They informed the creditors of that condition, and of the substance and conclusions of the previous meetings with Col. Sauer, Sorenson and the larger creditors, and explained their plans, estimations, suggestions and cost-figures for continuing the operations, and recommended the adoption of these plans and a change in management. The net result of that meeting was an agreement:

1. That Sorenson would be relieved of all management and authority in the further operations, and that Mr. W. E. McCourt, manager of the Greenville Sand & Gravel Company, the third largest creditor, would be placed in charge of operations, the Government representatives having informed the meeting that Mr. McCourt had been highly recommended to them for this work, they being satisfied, after investigation, of his qualifications.

2. That suitable machines for making the blocks would be made available by appellant, one of the machines then in use being old and unsuited for the purpose, and the other being under lease, with the rentals therefor in arrears.

3. That Marquette Cement Company and Greenville Sand & Gravel Company, the largest creditors other than appellant, the aggregate of whose debts was around $24,000, would agree to "stand-by."

4. That the representative of the Texas Company, whose debt was about $1,100, would recommend that his Company also agree to "stand-by," but the continuance

of operations was not dependent on that company so agreeing.

5. That all expense of operation in future, and those incurred for that purpose since April 30th, would be paid in cash.

6. That the small creditors, some twenty-three in number, whose claims aggregated $2,686.71, would be paid in full regardless when such debts were incurred, and that Lunceford would be considered a small creditor and his claim would be paid.

All the foregoing was embodied in an official written report and recommendation to Defense Plant Corporation, dated May 26, 1944, made by Brattleaf and Schroeder. And as to appellee, Lunceford, that report said ''Homer Lunceford is a small operator engaged in hauling and the rental of automotive equipment. His working capital is extremely limited and in order for him to continue with the services rendered to Borrower he had been forced to borrow funds from relatives and friends. Under these circumstances, it was the general consensus of all interested parties that Mr. Lunceford's account be paid . . .'' The report further recommended, after referring to the agreement of the larger creditors to stand-by, that ''Releases be made from the 'Suspended Credits Account' in an amount sufficient to pay all other creditors for accounts due April 30, 1944.''

Brattleaf and Schroeder agreed with McCourt upon his compensation. McCourt was immediately placed in charge, and took over all supplies and finished units on hand. Arthur Sorenson left for Racine, Wisconsin, and, so far as the record discloses, never came back to Greenville during, or actually had anything to do with, the subsequent operations. McCourt opened a bank account as trustee. It is not disclosed whether he was supposed to be acting as trustee for Sorenson or Smaller War Plants Corporation. However, Brattleaf later called McCourt over the telephone and told him to eliminate ''trustee,'' ''because (according to McCourt) those funds might be-

come attached by creditors in Greenville; if in Sorenson's name or my name as trustee.'' But it is further shown that all checks payable to McCourt were made to him as trustee and all were United States Treasury checks. This included both pay-roll operating, and McCourt salary, checks. McCourt testified he was employed by Smaller War Plants Corporation and looked to it for his compensation. The money to the credit of Sorenson in the bank was transferred to McCourt, as trustee. The operations ended September 3, 1944. During that time, the manager had collected some forty thousand dollars, including considerable bills receivable owing Sorenson, and over eight thousand dollars held back, or ''retained percentages.'' During such operations, there was paid out some seventy thousand dollars, all upon United States Treasury checks, around one hundred and twenty-five in number. During this time, McCourt was actually working under direction of appellant or its agent. He testified he only sent to Sorenson copies of production reports, requisitions for materials and copy of payroll sheets. All other communications and dealings were with appellant or its agent. The record contains numerous direct communications between McCourt and these Government corporations and their representatives. It shows direct negotiations for purchase of tires and the block-making machines· Some of the checks were issued upon requests, and some without requests, of Sorenson, but it is clear that these requests were mere form, and that, in substance, the business was operated and conducted directly through these Governmental agencies.

The operations came to an end because McCourt resigned. In a letter to Brattleaf and Defense Plant Corporation, he gave as his reasons for resigning (1) that the new machines had not been received and that by the time they could be received and installed bad weather would greatly hamper and add to the expense of operations; (2) that the United States Engineer had required the blocks to be placed in stock piles, and later loaded onto barges, thereby doubling the expense of moving the

blocks, which would cost four cents per block, for which the contract provided pay for only one-half cent per block; and (3) lack of time to devote to his duties. In another letter, he said he had been able to make only a small profit from the operations. It might be added that Lunceford and some of the other creditors continued to work for the new management after May 23rd, and were paid by appellant or its agent for that work. Lunceford testified he would not have done so except for the agreement to pay his prior debt. It might also be noted that some of. the small creditors were paid as per the agreement. On September 1, 1944, Defense Plant Corporation applied to its debt the balance of the suspense account fund, then amounting to $30,000.

It is explained in the record that "stand-by agreement" meant that the creditors so agreeing would take no action to collect their claims and would stand-by during the further operations and receive as payment on their claims whatever assets might remain after paying the expense of further operations, the payment of the small creditors as agreed and the debt to appellant.

Appellant, in reply to interrogatories propounded to it, explained the suspense account by saying "Smaller War Plants Corporation, in its discretion, had the right either to apply such fund against the indebtedness due from Sorenson or to permit Sorenson to use such fund, or any part of it, to defray the cost of operation."

Under the foregoing conditions, appellant says, first, that the agreement, if made, was without consideration and, therefore, not binding upon appellant; second, that it is not shown that the governing body of appellant or its statutory agent ever authorized the operation of the business and the payment of appellee's claims; and, third, that if there was a consideration and if authority is shown, that the agreement is a promise to pay the debt of another, and, not being in writing, is invalid under Section 264(a), Code 1942. We will pass upon these contentions in the order stated.

It is elementary law that a consideration may consist in a benefit to the promisor or a detriment to the promisee. Magee v. Catching, 33 Miss. 672; Miller v. Bank of Holly Springs, 131 Miss. 55, 95 So. 129, 31 A. L. R. 698. The arrangement here involved both factors. It was a benefit to appellant, at least at the time made it so thought, and, in fact, turned out to be. It appears that a small profit was realized and thousands of blocks were manufactured during the extended operations. These additional blocks were greatly needed in the emergency war work. Appellees and other unpaid creditors waived, or deferred the enforcement, of existing rights. Lunceford had transported to the plant sand and gravel which went into the making of the blocks. Queen City Lumber Company had furnished lumber and materials in aid of the operations. When the arrangement was made, Sorenson had on hand 135,000 finished blocks. McCourt took charge of these and they were delivered to the Government. It is possible that some of these creditors had liens upon these blocks. Whether they did, or, if so, whether such liens were superior to the claim of the Government, we do not decide. We notice the contract provides ''The obligation of the Government to make any of the payments required by this Article shall be subject to any unsettled claim for labor or material . . ,'' thereby recognizing the possibility of the existence of such liens. It is enough that the creditors deferred any action to collect their overdue claims by action against Sorenson or against the manufactured products to which their labor and materials had contributed. Had these creditors instituted proceedings the result would have been either the closing down of the plant or payment, or adjustment, of their claims by appellant.

On the second question, it will be noted that, in addition to the many other acts involved in the extended operations, appellant and its statutory agent handled, in receipts and disbursements, over one hundred thousand dollars. It is not claimed by appellant it had no authority to

perform these, or any other acts involved in such operations. The claim is that it had no authority to make the arrangement for payment of these small creditors out of the suspense account, yet, as a matter of fact, a number of such creditors were paid out of that account. The specific contention is that it is not shown that the directors of appellant or its agent actually adopted minutes authorizing payment to these creditors out of that account. Complainants proved all of the acts above set out herein. There was no proof of the actual existence or non-existence of minutes. The chancellor evidently was of the opinion that proof of all of these acts, with no claim on the part of appellant it had no authority to perform them, was prima facie proof of the existence of authority to carry out the agreement in full, especially since the actual existence, or non-existence, of minutes on the books of the directors at Washington, D. C., was a fact peculiarly within the knowledge of appellant, and appellant had answered interrogatories in this cause without stating as a fact whether such minutes did or did not exist. See Price et al. v. Haney, 174 Miss. 176, 163 So. 684, 164 So. 590. Appellant could not adopt and perform the part of agreement beneficial to it, and reject the part beneficial to the other parties thereto, at least, not without notifying the other parties of such action, so that they could assert their rights. Appellant put on no proof. When complainants rested their case in chief, appellant moved to exclude the evidence and for decree in its favor, which motion was overruled, and appellant declined to offer evidence. We think the chancellor was correct in holding that complainants had made out a prima facie case of authority in appellant to enter into this arrangement.

But appellant says this was an oral agreement to pay the debt of another, not enforceable under Section 264(a), Code 1942, which provides that an action shall not be brought whereby to charge a defendant "Upon any special promise to answer for the debt or default or miscarriage of another person . . ," unless the agreement or

promise, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some person by him lawfully authorized in writing. Appellees reply that since the proof justifies the conclusion that the directors authorized the agreement by adopted minutes, that such minutes constitute a writing, but, if not, that the proof shows appellant, for valuable and sufficient consideration, agreed to pay this debt as its own, and under such circumstances the case is not within the foregoing statute, and, further, that the nature of the arrangement here is not within the terms of the statute; that the agreement was for appellant to waive its claim to the suspense account and for appellees to be paid out of it. We think the last is the correct theory. Appellant testified, as shown above, that it had the right to either apply the suspense account fund to its debt or permit it to be used in operations. It did, as a matter of fact, permit a number of creditors to be paid out of that fund. It had the right to do that, according to its contention, under the terms of the trust deed and without any special action whatsoever of the directors. The loan had already been authorized. There is no question whatever that such agreement was made. In violation of that agreement, it appropriated this fund to its own use when the operations ceased, and after the other parties had carried out their part of the agreement. Appellees, under the facts here and in equity, were entitled to this fund to the extent of their respective claims.

The decree of the chancellor will be affirmed. Affirmed.

**Sydney Smith, C. J.**, did not participate in this decision.